IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| Richard A. Gill, Jr.,<br><br>            Plaintiff,<br><br>    vs.<br><br>Commissioner of Social Security,<br><br>            Defendant. | CASE NO. 1:22-cv-00981<br><br>DISTRICT JUDGE<br>Bridget Meehan Brennan<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Richard A. Gill, Jr. filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In February 2020, Gill filed applications for supplemental security income and disability insurance benefits alleging a disability onset date of May 5, 2005,[1] claiming he was disabled due to a combination of impairments including hypertensive diabetes, arthritis, severe obesity, chronic knee and

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

back pain, hypertension with headaches, migraine, pitting edema[2] and swelling in his legs, chronic fatigue, depression, and memory problems that developed after he suffered a transient ischemic attack[3] in 2009. Tr. 59, 170, 177, 192, 214–15.

The Commissioner denied Gill's applications at the initial level and upon reconsideration. Tr. 59–78, 79–98. Gill requested a hearing before an ALJ. Tr. 123–24. In February 2021, an ALJ held a hearing at which Gill and a vocational expert testified. Tr. 38–56. Two weeks later, the ALJ issued a written decision finding that Gill was not disabled. Tr. 12–33. The ALJ's decision became final in April 2022, when the Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981. Gill filed this action in June 2022. Doc. 1. He asserts that:

> 1. The ALJ erred when he failed to include the opined limitations made by the consultative examiner and State Agency reviewers regarding Gill's psychological impairments in the RFC;
>
> 2. The ALJ erred when he failed to find Gill disabled pursuant to Social Security Ruling (SSR) 19-2p; and

---

[2]     Edema is swelling in a body part or area of the body. *Pitting Edema*, WebMD, Heart Disease Resource Center page, Medical Reference section (last visited April 11, 2023), https://www.webmd.com/heart-disease/pitting-edema. Usually, if a person presses on an edema for a few seconds, it will bounce back upon release. *Id.* But if the edema retains a dimple—or pit—it's called a *pitting* edema. *Id.*

[3]     A transient ischemic attack, also called a ministroke, is a "temporary period of symptoms similar to those of a stroke." *Transient ischemic attack (TIA)*, Mayo Clinic, Diseases & Conditions database (last visited April 12, 2023), https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679.

> 3. The ALJ erred when he failed to include the combination of Gill's symptoms, including the need to elevate his legs, in the RFC.

Doc. 8, at 1.

## Factual background

### 1. Personal and vocational evidence

Gill was born in 1972. Tr. 57. He was 31 years old when he was last insured, 33 years old on his alleged disability onset date, and 48 years old when he filed his applications. Tr. 59. He has an eighth-grade education. Tr. 193. He has no vocationally relevant work experience.[4] Tr. 50, 59, 193.

### 2. Physical health impairment evidence[5]

Throughout the relevant time period, Gill was chronically obese. Tr. 264, 328. In February 2020, Gill arrived at Fairview Hospital seeking emergency care for months-long high blood pressure, a headache on his left side, swelling in his lower extremities, and frequent urination at night. Tr. 548. He reported that he had stopped taking his blood pressure medications four months earlier after losing health insurance coverage. *Id*. He smoked cigarettes every day and regularly used marijuana. Tr. 549. Gill indicated that he felt better when he

---

[4]     From 1990 through January 1999, Gill worked as a laborer through a temporary employment agency. Tr. 193. For three days in March 2006, he worked as a laborer in "[r]oadside assistance." *Id*. For two weeks in April 2014, he worked in construction as a laborer. *Id*. Gill also reported previous jobs refinishing bathrooms, transporting handicapped individuals, and working at an auto repair shop. Tr. 242.

[5]     This recitation of medical evidence is not intended to be exhaustive and is limited to the facts provided in the parties' briefs.

took the anti-hypertension medication atenolol-chlorthalidone. Tr. 551. The treating clinician found Gill obese and hypertensive, with high blood pressure and evidence of trace lower extremity edema. Tr. 550. Gill's musculoskeletal system and mental status were within normal limitations. *Id.* The clinician gave Gill hydralazine, which resolved his headache, and discharged Gill with a prescription for atenolol-chlorthalidone. Tr. 551.

Days later, Gill attended a post-emergency room follow-up visit with primary care physician Saaima Arshad, M.D., at Westown Physician Center. Tr. 546–48. Gill reported feeling better. Tr. 546. His blood pressure and lower extremity edema had improved. Tr. 547. Dr. Arshad noted that Gill was morbidly obese. *Id.* Dr. Arshad prescribed Lisinopril for Gill's blood pressure, aspirin for his edema, and Metformin for prediabetes. Tr. 547–48. Dr. Arshad referred Gill for further testing to determine if he was diabetic. *Id.*

In May 2020, SSA representative Malaysia Pollard contacted Gill for more information about his mental health impairment claims. Tr. 214–15. Gill denied ever receiving mental health treatment, being hospitalized for mental health reasons, or taking mental health disability leave. Tr. 215. Gill discussed his experience with depression, which began with the death of his mother in 1999, worsened when his father died in 2006, and worsened still after his son was diagnosed with schizophrenia in 2011. Tr. 215. Gill initially indicated that he wasn't sure whether depression would decrease his ability to work because he had so many physical health issues. Tr. 215. But Pollard asked Gill more

4

specifically whether his mental health had ever interfered with his work and Gill replied that depression may have slowed his pace at work because it used to distract him and interrupt his focus. *Id.* He recalled devoting work time to personal worries. *Id.* Gill said that his former physician[6] diagnosed him with depression in 2000 and scheduled an appointment with a mental health provider. Tr. 214. Gill missed the appointment because he was "too depressed to get out of the bed." *Id.* Gill indicated that he still has symptoms of depression and attributes these to unresolved feelings and guilt. Tr. 214.  Gill said that depression has changed his mood and motivation, and affects his daily activities. Tr. 215.

Gill told Pollard about his memory and cognition, reporting that he began to notice problems with his memory after having a ministroke in 2009. Tr. 215. He could no longer remember phone numbers and found it difficult to recall details about past events. *Id.* He denied issues with concentration. *Id.* Gill can follow instructions, read, and write, although he has hand tremors that make his handwriting somewhat illegible. Tr. 214, 215. He can (1) maintain his own hygiene but "may go a few days without showering and changing clothes" because of depression; (2) prepare meals; (3) manage his finances; and (4) pay his bills online. Tr. 215.

---

[6]     Gill said that from 1999 through 2012, he received medical care from Dr. Thomas Craig, III. Tr. 214. Gill indicated that he was not able to obtain records from Dr. Craig because Dr. Craig hasn't practiced medicine since being prosecuted for narcotics trafficking and closing his medical practice. *Id.*

In August 2020, Gill's attorney, Michael Liner, completed a Disability Report alleging a decline in Gill's medical conditions since his February 2020 initial filing. Tr. 219–24. Gill had previously reported ongoing issues with his left knee, but in August 2020, he indicated that his right leg was also starting to ache. Tr. 220. Gill also reported newly developed issues with his throat.[7] *Id*.

In August 2020, Gill had a telemedicine appointment with Dr. Arshad. Gill reported having back pain since he was 25 years old. Tr. 251. He complained of swelling in his feet and difficulty swallowing. *Id*. Dr. Arshad ordered Gill to schedule an echocardiogram, advised him to wear compression stockings, and recommended that he elevate his legs. Tr. 253. Dr. Arshad suggested that Gill's back pain might improve if he lost weight and referred Gill to a bariatric/metabolic specialist. Tr. 252. He referred Gill to a gastroenterologist to address his difficulty swallowing. *Id*.

Eight days later, Gill saw Kim L. Steams, M.D., at Lutheran Hospital, for aching pain in his left knee at rest and during the night. Tr. 250. Dr. Steams observed abnormalities in Gill's left leg including diminished range of motion

---

[7] Gill underwent a tracheotomy at age 17. Tr. 220.

in his knee, crepitation,[8] trace effusion,[9] and an antalgic gait.[10] Tr. 250. Gill reported that in March 2014, he underwent arthroscopic surgery for a torn meniscus in his left knee. Tr. 250, 297. Dr. Steams injected Gill's knee with Depo-Medrol. Tr. 250.

A few days later, Gill had a follow-up call with Westown physician Tarini Gunaratne, M.D. Tr. 250. Gill reported that he had improved control over his blood pressure. *Id*. Gill had been taking a double dose of atenolol-chlorthalidone and, as a result, his home readings showed significant improvement in his blood pressure. *Id*. Dr. Gunaratne adjusted Gill's dosage of the anti-hypertension medication accordingly. *Id*.

In October 2020, Gill saw Westown nurse Sharon Lyons, APRN/CNP for back and knee pain. Tr. 566. Gill said he was feeling well. *Id*. He acknowledged that he had not yet scheduled the echocardiogram. *Id*. Gill reported cramping in his legs and requested a prescription for potassium. *Id*. Gill said that he was not having any hypertension symptoms; specifically, he denied headaches,

---

[8]     Crepitus is the crackling, crunching, grinding, or grating sound that can occur when one flexes a joint. *Crepitus*, Cedars Sinai, Discoveries, (last visited Apr. 21, 2023) https://www.cedars-sinai.org/discoveries/crepitus.html.

[9]     Joint effusion (a swollen joint) happens when extra fluids flood the tissues around a joint, making it larger and puffier. *Joint Effusion (Swollen Joint)*, Cleveland Clinic, Health Library, Symptoms, (last visited April 21, 2023) https://my.clevelandclinic.org/health/symptoms/21908-joint-effusion.

[10]     An antalgic gait is a disruption in a person's walking pattern that is usually caused by pain. *Antalgic Gait: Causes, Symptoms, and Treatment*, Healthline, Health Conditions (last visited Feb. 24, 2023), https://www.healthline.com/health/antalgic-gait.

chest pains, palpitations, or dyspnea.[11] *Id*. Dr. Arshad observed that Gill had bilateral ankle edema, rating it less severe than it had been. Tr. 567. Dr. Arshad suggested regular aerobic exercise. *Id*.

In November 2020, Gill saw David A. Harrison, PA-C, at a Cleveland Clinic spinal surgery center. Tr. 573. Gill told PA Harrison that he hurt his back tearing out carpet at age 25 and had—for 23 years—suffered from constant back pain with occasional severe pain flare-ups. *Id*. He described pain that radiates down his legs, intensifies with prolonged immobility, and lessens with frequent positional changes. *Id*. Gill acknowledged that he was an everyday cigarette smoker and user of marijuana. Tr. 574. PA Harrison found that Gill had degenerative disc disease, decreased lumbar range of motion, and an antalgic gait. Tr. 577. PA Harrison prescribed Zanaflex and Mobic, Tr. 578, as well as physical therapy, Tr. 573. He indicated that he would consider sending Gill for a lumbar MRI in seven weeks if the medication and physical therapy did not improve Gill's condition. Tr. 577.

In December 2020, Gill spoke with Nurse Lyons over the telephone. Tr. 582. She explained that Gill's test results confirmed he had type II diabetes mellitus. *Id*. Lyons increased Gill's dosage of Metformin and provided diabetes education. *Id*.

---

[11]    Dyspnea is shortness of breath. *Dyspnea*, Cleveland Clinic, Health Library, Symptoms, (last visited Apr. 21, 2023) https://my.clevelandclinic.org/health/symptoms/16942-dyspnea.

Just over one week later, Gill had an appointment via videoconference with Westown physician Ronak J. Shah, M.D. Tr. 589. Dr. Shah noted Gill's history of hypertension, prediabetes, hyperlipidemia, morbid obesity based on body mass index (BMI), thyroid nodule, and chronic back and knee pain. *Id.* Gill indicated that he had smoked one pack of cigarettes per day and used marijuana twice daily for 30 years. *Id.* Gill told Dr. Shah that his back pain was "better," reporting that the Mobic and Zanaflex medications controlled it well. Tr. 589. Gill reported the same results with respect to his knee pain as a result of Mobic and Zanaflex. *Id.* Gill's blood pressure was under control and had improved, as had the swelling in his feet. Tr. 594. As such, Gill indicated that he was no longer interested in attending physical therapy or having a lumbar MRI. *Id.* He also acknowledged that he had not scheduled the echocardiogram and had not been wearing compression stockings. *Id.* Dr. Shah prescribed Gill a glucose monitoring kit and extended-release Metformin. Tr. 595. He replaced Gill's hypertension medication with Losartan and Hydrochlorothiazide due to a dry cough side effect Gill was experiencing. *Id.* Dr. Shah advised Gill to stop taking Mobic, start taking Motrin, and continue the Zanaflex for his pain. *Id.* He counseled Gill to lose weight and stop using tobacco and marijuana. *Id.*

### 3. *State agency*[12] *and other medical opinion evidence*

In June 2020, state agency consulting physician W. Scott Bolz, M.D., reviewed the medical evidence and found it insufficient to establish that Gill had any medically determinable physical impairment prior to September 30, 2003, the date on which he was last insured. Tr. 65, 74. Dr. Bolz determined that since February 2020, when Gill filed for benefits, Gill was capable of performing work at a sedentary level of exertion. Tr. 64–65. Dr. Bolz opined that Gill could lift and/or carry 20 pounds occasionally and ten pounds frequently; sit for six hours and stand and/or walk for two hours during an eight-hour workday with normal breaks; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. Tr. 64–65, 74–75. He further opined that Gill should avoid concentrated exposure to extreme cold and extreme heat, and avoid all exposure to hazards such as machinery and heights. Tr. 65, 75.

In August 2020, upon reconsideration, state agency consulting physician Steve McKee, M.D., affirmed Dr. Bolz's findings as consistent with and supported by medical evidence in the record. Tr. 85–86, 94–95.

---

[12] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In June 2020, Gill met with consultative psychological examiner Ryan R. Wagner, Psy.D., for a mental status evaluation. Tr. 241–46. Dr. Wagner noted that Gill appeared tired and depressed, with tearfulness and a primarily downcast gaze. Tr. 243–44. Gill initially did not mention mental health concerns to Dr. Wagner. Tr. 241–42. But when Dr. Wagner specifically asked about Gill's behavioral health, Gill said he was struggling with depressive symptoms. Tr. 243. Gill was not receiving mental health treatment. Tr. 244. He reported social withdrawal and a lack of motivation that made it difficult to complete household chores. Tr. 243. He otherwise attributed the limitations in his daily life activities to his poor physical health. *Id*.

Dr. Wagner diagnosed Gill with recurrent, severe major depressive disorder. Tr. 244–45. He opined that with appropriate intervention, Gill's prognosis was "guarded to poor." Tr. 245. Dr. Wagner found that while Gill was able to manage his own funds, there were aspects of Gill's performance during the evaluation that suggested Gill would be potentially limited in a work setting. Tr. 245–46. For example, when Dr. Wagner assessed Gill's ability to understand, carry out, and remember simple and complex instructions, he found that Gill's performance did not suggest that he had any difficulty understanding the instructions but did suggest that he might have difficulty remembering them. Tr. 245. When Dr. Wagner assessed Gill's ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, he opined that Gill "presented as

11

depressed[,] which may impact interpersonal interaction in work settings including limited or negative social interaction." *Id*. He wrote that Gill "did not present with intellectual limitations which would impact his ability to understand and respond to supervisory feedback." *Id*.

When Dr. Wagner assessed Gill's ability to deal with normal work pressures, he indicated that although Gill didn't present as having any intellectual or cognitive limitations that would affect him in this area, he "presented as emotionally overwhelmed when discussing current pressures which may impact his mood stability in a competitive work setting" and "reported problems managing pressure in prior work settings which contributed to mistakes and errors." Tr. 246. Dr. Wagner found that Gill had no indications of anxiety, was cooperative, had adequate hygiene, a normal rate of speech, no display of loose associations, flight of ideas, or delusional beliefs, and that Gill was fully oriented. Tr. 243-44. Dr. Wagner found that Gill's intellectual functioning was within normal limits, his judgment sufficient to make decisions affecting his future, and that he had the ability to track conversation without any significant difficulty and adequately conduct his own living arrangements. *Id*.

In July 2020, state agency consulting psychologist David Dietz, Ph.D., reviewed the medical evidence and found it insufficient to establish that Gill had any medically determinable mental impairment prior to September 30, 2003, the date on which he was last insured. Tr. 62, 72. Dr. Dietz determined

that since February 2020, when Gill filed for benefits, Gill was moderately limited in his ability to: (1) understand, remember, or apply information; (2) interact with others; concentrate, persist, or maintain pace; and (3) adapt or manage himself. *Id.* Dr. Dietz found that Gill had the adequate understanding and memory to: (1) complete two- to three-step tasks in an environment where the production standards and schedule were more flexible; (2) interact appropriately with others in a superficial manner; and (2)  adapt to changes in the workplace as long as the duties were relatively static. Tr. 66–67, 76–77.

In August 2020, upon reconsideration, state agency consulting psychologist Aracelis Rivera, Psy.D., affirmed Dr. Dietz's findings. Tr. 83, 87–88, 92, 96–97.

### 4.  *Testimonial evidence*

ALJ George Roscoe held a hearing in February 2021 at which Gill testified. Tr. 41–50. He was represented by attorney Michael Liner. Tr. 38, 50, 53–56. At five feet, ten inches tall, Gill weighs 402 pounds. Tr. 43. He spends his days at home, seated in a reclining chair with his feet elevated above the level of his heart, as per the recommendation of his doctor. Tr. 41, 42. The only time that Gill goes outside is when he drives his wife to the grocery store. Tr. 42–43. This happens "[o]nce in a while" and Gill doesn't "even" get out of his truck at the store. Tr. 43.

One of Gill's impairments is back pain and soreness. Tr. 43, 45–46. He hurt his back "quite a few years ago" after which it "started giving [him]

13

problems." Tr. 43. He can stand for 15 to 20 minutes before his legs and back start to hurt and he needs to sit down. Tr. 45. His ability to remain seated is also limited because his back starts to ache if he doesn't periodically stand and stretch. Tr. 45. Gill can sit for an hour or two, though that would "really make his back start to ache." Tr. 46. Back pain and soreness also prohibit Gill from lying down for long periods of time, so he doesn't sleep well at night. Tr. 48. If his back hurts during the night, he will get out of bed and sit in his reclining chair. *Id*. Gill's sleep is also interrupted by headaches. Tr. 46. Sometimes, he feels fine when he goes to bed then develops a severe headache during the night. *Id*. The pain wakes him up and prevents him from falling back to sleep for several hours. *Id.* Since Gill doesn't sleep well, he struggles to wake up and usually still feels tired in the morning. Tr. 46. He compensates by napping for "a couple of hours" each day. Tr. 46, 47, 48. He could get through a day without a nap but it would be "rough going." Tr. 48. Fatigue is thus another of Gill's impairments. Tr. 46–47. Fatigue would make it difficult for Gill to maintain a work schedule. Tr. 48.

Gill is also impaired due to knee problems and pain. Tr. 44–45. "Quite a few years ago," he hurt his knee helping someone move and underwent surgery, but his knee never healed properly. Tr. 43–44. His knee continues to "give him problems." Tr. 44. Due to "a pride thing," Gill is reluctant to use an ambulatory aid to get around. Tr. 45. Gill's orthopedist told Gill that both of his knees need to be replaced, but Gill is disinclined to have any surgery after

14

a bad experience in his past. Tr. 44–45. About a decade ago, he awoke during a surgical procedure. Tr. 45. He "crashed" during recovery and couldn't be revived for "like, five hours" which resulted in his placement on a "breathing machine." *Id*. Both of Gill legs are impaired by pain and swelling, as well as "pretty bad" pitting edema. Tr. 46. To reduce the swelling, Gill sits in his recliner and elevates his legs, securing them with a pillow, for most of the day. Tr. 42–43, 46. If Gill were to sit in a regular chair, the swelling in his legs would probably increase. Tr. 46. Gill was recently diagnosed with diabetes and had been bitten by a dog on his foot, so that is "giving him problems." Tr. 44.

With respect to his mental health, Gill cannot picture himself in a workplace or dealing with the "hassles of coworkers." Tr. 49.  He "just can't do it." *Id*. Gill's inability to work began with depression after his mother died. *Id*. Six years later, his father was "t-boned by a truck and killed in a car accident." *Id*. Since then, "that's all [he] think[s] about[,] mostly." *Id*.

His back and knee pain also prevent him from working. Tr. 43, 49. He would need extra breaks during the day and "couldn't be accommodated like that." Tr. 49. He is supposed to go to physical therapy but "honestly" doesn't think he can "even do that." Tr. 50. He scheduled "a couple of appointments" but cancelled because he "couldn't even" make it to them. Tr. 50.

After Gill, vocational expert Robert Mosley testified. Tr. 50. The ALJ qualified Mosley as an expert and, having found that Gill had no vocationally relevant prior work experience, presented Mosley with a series of

hypotheticals. Tr. 50. The ALJ asked Mosley to opine as to whether and what type of work a hypothetical individual with the same age, education, and lack of work experience as Gill who had the limitations assessed in Gill's residual functional capacity (RFC),[13] described below, would be able to perform at a sedentary level of exertion. Tr. 50–51. Mosley said that a hypothetical individual with Gill's RFC could perform unskilled, sedentary jobs such as a final assembler, lens inserter, or polisher of eyeglass frames. Tr. 51–52.

Mosley opined that such an individual who was absent two or more days per month on an ongoing basis would exceed the level of absenteeism tolerable to most employers and be precluded from all work. Tr. 52. Mosley further opined that such an individual who was off-task for 20 percent or more of each workday would, similarly, exceed the amount of off-task time that was acceptable to most employers and be precluded from all work. Tr. 52.

Attorney Liner asked Mosley to consider the employability of an individual whose legs would need to be elevated at or above heart-level for 50 percent or more of each workday. Tr. 53. Mosley said that if elevating the person's legs caused him or her to be off task more than 15 percent of the time, the reduction in productivity would render the individual unable to maintain

---

[13]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

employment. Tr. 53. Mosley emphasized that it was the off-task time, not the need to elevate the legs, that would preclude such an individual from all work. *Id*. Based on Mosley's experience with the setup of workstations, he opined that an unskilled worker performing a job with a sedentary level of exertion would not be physically able to elevate his or her legs at or above heart-level while remaining on-task. Tr. 54.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2003.

2. The claimant has not engaged in substantial gainful activity since May 5, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant does not have any severe impairments as of the date last insured, specifically September 20, 2003 (20 CFR 404.1520(c)).

4. As of the protective filing date of the claimant's application for benefits under Title 16 of the Act, the claimant has the following severe impairments: super morbid obesity, major depressive disorder, chondromalacia with meniscal tear of left knee, hypertension, and migraine (20 CFR 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

6. …[T]he claimant has the residual functional capacity (20 CFR 416.945) to perform sedentary work as defined in 20 CFR 416.967(a), except for no

climbing of ladders, ropes or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching; no concentrated exposure to temperature extremes, vibration or high background noise (as in a factory setting); no exposure to hazards (heights, machinery, commercial driving); and mental limitation that he perform routine, repetitive tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (with "superficial" meaning no arbitration, negotiation or confrontation), and no interaction with the public as a job requirement (20 CFR 416.969a).

7. The claimant has no past relevant work (20 CFR 416.965).

8. The claimant was born on February 25, 1972 and was 33 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date; he remains a younger individual upon his attainment of age 45 on February 24, 2017 (20 CFR 416.963).

9. The claimant has a limited education (20 CFR 416.964).

10. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

Tr. 17–33.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability.

42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage

18

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each

element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id*.

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

Gill challenges the ALJ's RFC determination and alleges three errors. Doc. 8, at 1. First, Gill alleges that the ALJ's RFC improperly discounts the opinion of consultative psychologist Dr. Wagner. Doc. 8, at 7, 9–10. Second, Gill alleges that the ALJ's RFC fails to properly account for the potential effect of obesity on his other conditions. Specifically, Gill argues that the ALJ's failure to reference specific statements by Dr. Arshad demonstrates inadequate consideration of the cumulative effect of Gill's impairments. Doc. 8, at 12–13. Third, Gill alleges that the ALJ's RFC should have included a limitation for Gill to elevate his legs throughout the day. Doc. 8, at 13–16.

> *Issue 1: The RFC's mental RFC limitations as compared to those assessed by Dr. Wagner and the state agency doctors.*

Gill's first issue challenges the formulation of Gill's mental RFC. Doc. 8, at 7. Gill alleges that the ALJ erred when he rejected the opinion of consultative psychologist Dr. Wagner. *Id*. at 9–11.

In evaluating medical opinion evidence, the Commissioner is required to appraise the persuasiveness of all such opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner

must explain the *supportability* and *consistency* factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec*., 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, the ALJ found persuasive the findings of state agency consulting psychologists Dr. Bolz and Dr. McKee, and unpersuasive the findings of consultative examiner Dr. Wagner. Tr. 30–32 (citing Tr. 62, 72, 66-67, 76-77, 83, 87-88, 92, 96-97). Although the ALJ deemed the opinions of Dr. Bolz and Dr. McKee persuasive, he noted that he was not adopting, verbatim, all of the assessed limitations. Tr. 30, 31. The ALJ found the "general theme" of Dr. Bolz's and Dr. McKee's assessments persuasive as he formulated the RFC. Tr. 30. The decision highlights the fact that, by the time both state agency doctors were developing their opinions, they had the benefit of Dr. Wagner's full report—his clinical findings and medical opinions—as well as Gill's complete medical evidence record. Tr. 28, 31.

In turning to Dr. Wagner's opinion, the ALJ noted that although the portion of Dr. Wagner's opinion finding that Gill could manage his own funds was not inconsistent with the record, the rest of Dr. Wager's assessment was riddled with vague language that obscured Dr. Wagner's position on whether

Gill's abilities were limited and to what degree. Tr. 31. For example, the ALJ noted that Dr. Wagner's reliance on the phrase "may impact" contributed to the unpersuasive, imprecise nature of his opinions. *Id*. The ALJ juxtaposed "the more complete record, including the opinions of the state agency psychological consultants" that supported limitations in all of Gill's areas of mental functioning and provided related mental capacity assessments. *Id*.

In the decision, the ALJ considered the medical opinions as follows:

> As for the opinion evidence, the undersigned finds persuasive the opinions of the state agency medical consultants, W. Scott Bolz, M.D., (06/08/20), and Steve McKee, M.D., (08/27/20).They reviewed the claim at the initial and reconsideration level and opined that the claimant is limited to light exertion, with standing/walking 2 hours; occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; must avoid concentrated exposure to temperature extremes; and avoid all exposure to hazards (3A/6-7; 4A; 7A/5-6; 8A). The undersigned finds these opinions persuasive because the record supports reducing standing and walking throughout a full workday, in addition to limitations on climbing, postural activities, exposure to hazards and environmental factors; however, the more complete record supports further reducing the claimant to sedentary exertion and additional environmental limitations as noted above. While the undersigned did not adopt all portions of the state agency medical consultants' opinions, the undersigned found the general theme of these specific limitation persuasive when formulating the above residual functional capacity assessment. As to the portions adopted, the undersigned finds these portions persuasive because they are supported by the evidence the doctors reviewed, and they are consistent with the other evidence of record. The evidence of record developed after they rendered

23

their opinions did not change materially or in a manner that would otherwise render their opinions inconsistent with the record generally. Moreover, the doctors' opinions are informed by their program knowledge and medical expertise. For these reasons, and based on this evidence, the undersigned finds these opinions persuasive.

The undersigned finds persuasive the opinions of the state agency psychological consultants, David Dietz, Ph.D. (07/23/20), and Aracelis Rivera, Psy.D. (08/28/20). They reviewed the claim at the initial and reconsideration level and opined that the claimant has moderate limitations in all paragraph B criteria (3A/4; 4A; 7A/3); with specific limitations that he is limited to understanding, remembering, concentrating, and persisting to complete 2-3 step tasks, in an environment where production standards are more flexible; interacting with others in a superficial manner; and adapting to changes in a work space in which work duties are relatively static (3A/7-9; 4A; 7A/7-8; 8A). The undersigned finds these opinions persuasive because they are supported by the evidence the doctors reviewed, and they are consistent with the other evidence of record. The evidence of record developed after they rendered their opinions did not change materially or in a manner that would otherwise render their opinions inconsistent with the record generally. Moreover, the doctors' opinions are informed by their program knowledge and expertise in psychology. With respect to specific mental functional limitations, the undersigned utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. While the undersigned did not adopt the state agency psychological consultants' opinions verbatim, the undersigned found the general theme of these specific limitations persuasive when formulating the above residual functional capacity assessment. For these reasons, and based on this evidence, the undersigned finds these opinions persuasive.

> The undersigned finds unpersuasive the opinion of the examining consultative psychologist, Ryan Wagner, Psy.D. (June 25, 2020). He opined that the claimant has no limitations in managing his own funds; he has difficulty remembering instructions; his energy was below average to complete tasks; his depression may impact his ability to interact; and he presented as overwhelmed which may impact his mood stability and ability to handle pressure in work settings (1F/5-6). The portion noting that the claimant has no limitations managing funds is not inconsistent with the evidence of record; however, otherwise this opinion is unpersuasive because it is vague as to the degree of limitation the claimant has experienced, with use of phrases such as "may impact". The more complete record, including the opinions of the state agency psychological consultants, supports limitations in all areas of mental functioning, with related mental functional limitations. The vague nature of this opinion renders it unpersuasive.

Tr. 30–32.

Gill does not dispute the ALJ's finding about the persuasiveness of the state agency doctors' opinions. Incorporating their findings into his RFC assessment, the ALJ found that Gill had the mental RFC to perform routine, repetitive tasks in a low-stress environment—without a fast pace, strict quotas, or frequent duty changes—involving superficial interpersonal interactions with co-workers and supervisors—with "superficial" meaning no arbitration, negotiation, or confrontation—and no interaction with the public as a job requirement. Tr. 25.

Gill argues that the ALJ did not provide sufficiently specific evidence when discussing the persuasiveness of Dr. Wagner's opinion. Doc. 8, at 15.

25

From the beginning, Gill misreads and misquotes the ALJ. Doc. 8, at 9. He says that the ALJ rejected Dr. Wagner's opinion "as Dr. Wagner found that Gill could manage his own funds." *Id*. He adds that the ALJ "based his conclusion on one sentence finding that 'there were not apparent deficits which would impact the ability of Mr. Gill to manage funds.'" *Id*. From these assertions, Gill concludes that "[t]he ALJ's focus on this one finding was inconsistent with the evidence of this matter." *Id*.

But the ALJ didn't find Dr. Wagner's opinion unpersuasive on this basis. Indeed, the ALJ said that the part of Dr. Wagner's opinion in which he finds that Gill is capable of managing his own funds is "*not inconsistent with the evidence*." Tr. 31 (emphasis). Instead, the ALJ discounted Dr. Wagner's opinion because it was vague. Tr. 31.

Gill barely discusses the reason the ALJ discounted Dr. Wagner's opinion and baldly asserts that Dr. Wagner's opinion is not vague. Doc. 8, at 10. Gill fails, however, to articulate why he believes this is so; he simple asserts this belief without developing any foundation for his argument. *Id*. Gill has forfeited this argument as undeveloped and perfunctory. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Even if the Court were to consider the merits of Gill's perfunctory argument that Dr. Wagner's opinion is not vague, there is no evidence to support it. There is, however, substantial evidence to support the finding that Dr. Wagner's opinion *is* vague. As the ALJ noted, Dr. Wagner vaguely twice said that the manner in which Gill "presented … may impact" him in a work setting. Tr. 31; *see* Tr. 245–46. Dr. Wagner's assessment also includes descriptions of what Gill's abilities or symptoms "suggest" or "indicate." *Id*. But Dr. Wagner does not clearly opine about whether Gill has limitations or how those limitations would affect Gill's ability to work. *See* Tr. 245–46.

Gill continues his argument by reciting the list of depression symptoms he reported to Dr. Wagner during the mental health assessment—including crying spells, fatigue, loss of energy, feelings of hopelessness, feelings of worthlessness, indecisiveness, loss of pleasure in activities, low motivation, insomnia, poor concentration, poor quality of mood, social withdrawal, significant weight gain, and periods of hypersomnia. Doc. 8, at 10 (citing Tr. 243). Although Gill does not clarify his purpose in including this list, it may be that he has listed his symptoms to support the idea that the ALJ was obliged to adopt Dr. Wagner's opinion, perhaps based on the consistency with which Gill reported his symptoms of depression.[14] *Id*. If this is Gill's argument, it is

---

[14]    The Commissioner, in his brief, characterizes Gill's argument as suggesting that the ALJ was obligated to find Dr. Wagner's opinion persuasive. *See* Doc. 10, at 16–17. Gill did not file a reply brief and thus, has not disputed this interpretation.

unavailing. The mere recitation of symptoms does not support a limitation. *See* 20 C.F.R. § 404.1529(c); Social Security Rule (SSR) 96–7p, 1996 SSR LEXIS 4, at *5–8 (1996) (establishing the two-part process for an ALJ assessing the credibility of the claimant's statements about symptoms); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 472 (6th Cir. 2003). And so long as the ALJ explains his decision adequately, he is not obligated to adopt the opinion of a medical source. *See Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *10 (N.D. Ohio Sept. 30, 2016); *Jefferson v. Colvin*, No. 1:14-cv-01851, 2015 WL 4459928 at *6 (N.D. Ohio July 21, 2015). The ALJ sufficiently explained his decision to discount Dr. Wagner's opinion. Gill may not agree with the ALJ's explanation, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

Next, Gill objects to the ALJ's treatment of the state agency opinions, whose persuasiveness is undisputed, by claiming that the ALJ erred when he did not adopt their assessed limitations verbatim. Doc. 8, at 10. Gill says that the RFC should have limited him to jobs requiring two- to three-step tasks in an environment where production standards and schedules are flexible and social interaction is superficial at most. *Id*. The state agency consultant doctors opined that Gill's concentration and persistence would limit him as described, and because the ALJ found the opinions of the state agency consultant doctors persuasive, Gill claims the ALJ erred when he did not include the assessed limitations verbatim in Gill's RFC. *Id*.

28

But Gill ignores the ALJ's decision. The ALJ said both that Gill was limited to superficial interactions. Tr. 25. He also said that he found persuasive the opined limitation to "2-3 step tasks." Tr. 31. He explained his view that the limitation was not materially different from what he set out in the RFC, Tr. 29, which "repetitive tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes)." Tr. 25.

Gill fails to acknowledge that the ALJ said he found persuasive the "general theme" of the state agency doctors' limitations as he formulated his RFC. Tr. 31. Even where an ALJ provides "great weight" to a medical source opinion, there is no requirement that an ALJ adopt that opinion verbatim; nor is the ALJ required to adopt the opinion's limitations wholesale. *Reeves v. Comm'r of Soc. Sec. Admin.*, 618 F. App'x. 267, 275 (6th Cir. 2015). An ALJ need only explain his or her decision sufficiently enough for a subsequent reviewer to understand the persuasive value of the opinion and the ALJ's reasons for finding as he or she did. *Id.* (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir.2013); 20 C.F.R. § 404.1527(c); SSR 06-3p).

> *Issue 2: SSR 19-2p and the ALJ's consideration of the totality of Gill's impairments, including his obesity.*

In Issue 2, Gill challenges the ALJ's consideration of obesity in combination with Gill's other impairments, arguing that the ALJ violated SSR 19-2p. Doc. 8, at 12–13. Gill writes that, "the ALJ found that Gill had super morbid obesity, but erroneously disregarded the statements by Dr. Arshad that his knee and back problems were related to, and would improve, if he lost

29

weight." Doc. 8, at 13. Although Gill claims that the ALJ erroneously disregarded Dr. Arshad's opinion, he doesn't explain why, assuming that happened, the ALJ erred. *Id.* Moreover, Gill doesn't explain why the ALJ was required to include the self-evident statement that Gill's symptoms would improve if he lost weight. So Gill has forfeited this issue. *See McPherson*, 125 F.3d at 995–96.

Gill discusses SSR 19-2p but doesn't explain what SSR 19-2p requires, or how the ALJ fell short of its requirements. Doc. 8, at 12–13. Gill raises these claims in a perfunctory manner, unsupported by any argument. As such, Gill forfeited this argument, too. *See McPherson*, 125 F.3d at 995–96.

Even if the Court were to consider Gill's arguments, however, the record supports the ALJ's assessment. In his decision, the ALJ did not specifically reference the two statements that Dr. Arshad made to Gill suggesting that losing weight might improve his back and left knee conditions. Tr. 252 ("Back pain may improve with weight reduction"), 556 ("reduce weight" as an "[a]ssessment" or "plan" for the arthritis in Gill's left knee). Gill argues that the lack of discussion demonstrates the ALJ's inadequate consideration of the totality of Gill's impairments. Doc. 8, at 12-13.

That's simply not the case. While it is true that the ALJ did not specifically quote Dr. Arshad on the issue of obesity, the ALJ's decision nonetheless documents ample consideration of obesity as it could affect Gill's other impairments in accord with SSR 19-2 at multiple sequential steps. Tr.

30

20, 25, 30. At step three, Tr. 19–25, the ALJ included the following under the

"*Obesity*" sub-heading:

> The undersigned has also given consideration to Social Security Ruling 19-2p, which instructs adjudicators to consider the effects of obesity under the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, and to the extent the condition may impact the claimant's other impairments at this Step of the sequential analysis. (See also Listing 1.00Q). Accordingly, the following analysis includes a consideration of the impact, if any, that obesity has had on the claimant's other impairments. However, the medical evidence of record does not indicate that the claimant's obesity contributes to any other severe impairment that would cause that impairment to meet a listing in 20 CFR Part 404, Subpart P. Appendix 1,

Tr. 20. Throughout the ALJ's development of the RFC, he considered Gill's

obesity alone and in the context of SSR 19-2p and wrote:

> The undersigned has given consideration to Social Security Ruling 19-2p, which instructs adjudicators to consider the effects of obesity not only under the Listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. When obesity is identified as a medically determinable impairment, consideration will be given to any functional limitations resulting from the obesity in the residual functional capacity assessment in addition to any limitations resulting from any other physical or mental impairment identified.

Tr. 25. The ALJ's final, meaningful consideration of obesity within the SSR 19-

2p guidelines is documented under the "*Summary of Residual Functional*

*Capacity*" heading:

The pain, fatigue, effects of treatment, and residual functioning related to flare-ups of the claimant's migraines, musculoskeletal impairments, and hypertension, as exacerbated by obesity, support limiting the claimant to no more than sedentary exertion, with additional limitations on climbing, postural activities, environmental factors, and exposure to hazards, as noted above. The cumulative effects of the pain, fatigue, effects of treatment, and residual functioning related to physical impairments, in addition to the symptoms and effects of treatment related to the claimant's mental impairments, support limiting the routine nature of tasks, production and time demands, work duty changes, and the nature and frequency of interactions with others, as noted above.

This finding reflects the undersigned's consideration of the claimant's obesity to the extent it limits the claimant's functioning, singly, and in combination with the other impairments, pursuant to SSR 19-2p. The above postural activity restrictions are reasonably consistent with the claimant's obesity. This finding also reflects the undersigned's consideration of the claimant's headache/migraine to the extent the condition limits the claimant's functioning, singly, and in combination with [his] other impairments, pursuant to SSR 19-4p. This residual functional capacity finding is supported by, and consistent with, the evidence of record, including the medical evidence, examination findings, the persuasive portions of the medical opinions of record, and the claimant's allegations consistent with the medical evidence. This finding reasonably accommodates the physical and mental limitations the claimant experiences from impairments.

Tr. 30.

So, contrary to Gill's assertions, the ALJ expressly considered Gill's obesity and its potential effects on his other impairments. "The ALJ is charged

with assessing a claimant's RFC 'based on all of the relevant medical and other evidence' of record". 20 C.F.R. § 416.945(a)(3); *see Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13-cv-260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014). Importantly, "[t]he Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). The ALJ did not need to quote Dr. Arshad in order to demonstrate his consideration of Gill's obesity and the extent to which it may affect his other impairments. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole."); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

There's more. The ALJ found persuasive the prior administrative medical findings of state agency consultants Dr. Bolz and Dr. McKee. Tr. 30–31 (citing Tr. 64–65, 74–75, 85–86, 94–95). The findings of these doctors considered and accounted for evidence related to, and based upon, a review of the full medical record, Tr. 241-–559, including the omitted statements that Gill claims show the inadequacy of the analysis. Doc. 8, at 12–13 (citing Tr. 252, 556). Gill does not challenge the persuasiveness of the state agency doctors' opinions—neither of which specifically quotes Dr. Arshad. Tr. 64, 65, 74, 75, 845, 86, 94, 95. This undermines Gill's argument that such an omission necessarily demonstrates inadequate consideration of morbid obesity.

The ALJ determined Gill's RFC with sufficient consideration of Gill's weight and obesity's capacity to affect other impairments. Tr. 20, 25, 30. As such, the ALJ did not err, under SSR 19-2p or otherwise. Reading the decision as a whole, with common sense, shows properly consideration of the evidence.

*Issue 3: The ALJ's consideration of the totality of Gill's symptoms, including Gill's need to elevate his legs, in the development of the RFC.*

Issue 3 challenges whether and how the ALJ accounted for the totality of Gill's symptoms, including his need to elevate his legs, in the RFC. Doc. 8, at 13. Although Gill, who was and is represented by counsel, interposes that the ALJ erred in finding that Gill could engage in substantial gainful activity, *id.* at 15., the crux of his third argument appears to be that "the ALJ erred when he failed to consider the combination of Gill's impairments and find that he was unable to engage in full-time sustained work activity." *Id.*

Contrary to Gill's assertions, the ALJ considered the totality of Gill's impairments, including the medical evidence of his leg swelling and edema. Tr. 26 (leg swelling); 27 (edema) (citing Tr. 252, 259, 553, 566, 589). He is correct that the ALJ did not add a limitation, uncontemplated by the medical opinion evidence, regarding Gill's self-reported need to elevate his legs on an ongoing basis. Tr. 25, 30. Substantial evidence supports the ALJ's omission of this limitation. For example, as the ALJ cited in his decision, Gill reported the resolution of his back pain and lower extremity edema and, as a result, indicated he would not be attending physical therapy. Tr. 27. And the ALJ found persuasive that the prior administrative medical findings—which did

34

not include a limitation for elevating the legs. Tr. 30–31. Also, Dr. Arshad made the suggestion that Gill elevate his legs just once, in August 2020. Tr. 577. Dr. Arshad recommended Gill elevate his legs, wear compression stockings, and submit to an echocardiogram. Tr. 253. Dr. Arshad wrote, "[n]o edema noted" in her physical examination during that appointment. Tr. 576. As previously mentioned, Dr. Bolz and Dr. McKee reviewed the entire medical record and relied on it as the basis for their findings. Gill does not challenge the ALJ's reliance on the prior administrative findings, and yet neither doctor included a limitation for Gill to elevate his legs. Tr. 64–65, 74–75, 85–86, 94–95.

Also, Gill's claim presupposes that Dr. Arshad's suggestion that he elevate his legs would meet the durational requirement for appropriate consideration in a disability context. Tr. 13, 16. But this isn't the case. Dr. Arshad made recommendations—that Gill get an echocardiogram, elevate his legs, and wear compression stockings—to reduce Gill's lower extremity edema less than 12 months before Gill reported the resolution of his lower extremity edema. Tr. 253, 576, 594–95. The edema improved despite Gill's noncompliance with two of Dr. Arshad's three directives, in that Gill never had the echocardiogram and did not wear the stockings. Tr. 594–95, 566–68.

Gill ignores the standard of review and, in effect, invites the Court to reweigh the evidence to consider an accommodation uncontemplated below. But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann*, 817 F. App'x. at 196 (citing

*Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019)). Substantial evidence supports the ALJ's omission of any limitation related to leg elevation given the absence of a medical source opinion saying it was necessary and the reported resolution of Gill's lower extremity edema. Tr. 26–27, 253, 567–68, 594. Gill hasn't shown any flaw in the ALJ's decision-making process. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Whether substantial evidence supports the conclusion that Gill could have been found disabled is irrelevant unless he shows that substantial evidence does not support the ALJ's decision, which he failed to do.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 24, 2023

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)